UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

HASAN CARTER, et al.,

                 Plaintiffs,

    v.

CHRISTINE GREGOIRE, et al.,

                 Defendants.

CASE NO. C09-5393BHS

ORDER DENYING
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

      This matter comes before the Court on Plaintiffs' Motion for Preliminary
Injunction (Dkt. 26). The Court has considered the pleadings filed in support of and in
opposition to the motion and the remainder of the file and hereby denies the motion for
the reasons stated herein.

## I. PROCEDURAL HISTORY

      On June 29, 2009, Plaintiffs filed a complaint for injunctive and declaratory relief
against Defendants.  Dkt. 1.  Plaintiffs also filed a Motion for Temporary Restraining
Order.  Dkt. 2.  On June 30, 2009, Defendants responded.  Dkt. 19.  On July 1, 2009, the
Court held a hearing on Plaintiffs' motion (Dkt. 29) and issued a temporary restraining
order (Dkt. 27).

      On July 1, 2009, Plaintiffs filed a Motion for Preliminary Injunction.  Dkt. 26.

      On July 8, 2009, Plaintiffs filed an Amended Complaint.  Dkt. 32.

On July 22, 2009, Defendants responded to Plaintiffs' motion. Dkt. 43. On July 28, 2009, Plaintiffs replied. Dkt. 58. On July 30, 2009, the Court held a hearing on the motion and extended the temporary restraining order to expire on August 12, 2009. Dkt. 71.

## II. FACTUAL BACKGROUND

### A. Medicaid

Medicaid was established in 1965 in Title XIX of the Social Security Act, 79 Stat. 343, as amended, 42 U.S.C. § 1396, *et seq*. Medicaid is jointly funded by the federal government and participating states to provide medical assistance to certain categories of low income individuals. *Schweiker v. Gray Panthers*, 453 U.S. 34, 36 (1981) (quoting *Harris v. McRae*, 448 U.S. 297, 301 (1980)). To be eligible for Medicaid funding, states must submit and have approved by the Secretary of Health and Human Services a state plan for medical assistance ("Medicaid State Plan"). *See* 42 U.S.C. § 1396(b)(2).

A Medicaid State Plan must include certain services, including in-patient hospital services, nursing facility services, laboratory and X-ray services, hospice care, and case-management services. *See id*. § 1396d(a)(1)-(5), (17)-(21). Other services, such as personal care services, are optional; states may provide these additional benefits. *See* 42 U.S.C. §§ 1396d(a)(24), 1396a(a)(10); 42 C.F.R. § 440.225. Similarly, states participating in Medicaid are required to provide services to certain groups of persons and may, at their option, choose to extend services to other groups of low income persons. *See* 42 U.S.C. § 1396a(a)(10); *Coye v. U.S. Dep't of Health & Human Servs.*, 973 F.2d 786, 789-90 (9th Cir. 1992).

### B. Personal Care Services

Personal care services involve provisions of assistance with daily living activities. Defendants claims that this type of care is an "optional" service that the state may offer under Medicaid. Dkt. 43 at 5. Specifically, if an individual's "income and resources are

insufficient to meet" the costs of personal care services, then a state may provide medical assistance payments for:

> personal care services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease that are (A) authorized for the individual by a physician in accordance with a plan of treatment or (at the option of the State) otherwise authorized for the individual in accordance with a service plan approved by the State, (B) provided by an individual who is qualified to provide such services and *who is not a member of the individual's family*, and (C) furnished in a home or other location . . . .

42 U.S.C. § 1396d(a)(24) (emphasis added).

The Centers for Medicare & Medicaid Services ("CMS") described "personal care services" when issuing the final rule implementing the requirements for Medicaid coverage of these services. *See* Dkt. 43-2, Medicaid Program; Coverage of Personal Care Services, 62 Fed. Reg. 47,896 (Sept. 11, 1997). CMS explained that, as historically used in the Medicaid program, "personal care services" means "services related to a patient's physical requirements, such as assistance with eating, bathing, dressing, personal hygiene, activities of daily living, bladder and bowel requirements, and taking medications." *Id*. "These services primarily involve 'hands on' assistance by a personal care attendant with a recipient's physical dependency needs (as opposed to purely housekeeping services)." *Id*.

Defendants emphasize that, under the federal statute, family members are disqualified from medical assistance payments for personal care services. Dkt. 43 at 5-6; *see supra*. CMS defines "family member" to mean a "legally responsible relative." 42 C.F.R. § 440.167(b). In promulgating this definition, CMS observed that it was consistent with Congress's clear intent "to preclude family members from providing personal care services," and that the agency has

> always maintained that spouses and parents are inherently responsible for meeting the personal care needs of their family members, and, therefore, it would not be appropriate to allow Medicaid reimbursement for such services.

62 Fed. Reg. at 47,899. Moreover, CMS clarified that "States can further restrict which family members can qualify as providers by extending the definition to apply to individuals other than those legally responsible for the recipient." *Id*. The agency explained that this flexibility would allow states to "tailor their programs to meet their individual needs." *Id*.

CMS recognized that, in some situations, it is unnecessary for a registered nurse to supervise the personal care services. *Id*. at 47,897. In fact, CMS explained that

> while some individuals' conditions may dictate a need for nurse supervision, many individuals receiving personal care services are either capable of directing their own care or have needs that are not based on a "medical" condition (for example, individuals with mental retardation). Additionally, a stable, physically disabled beneficiary without cognitive impairments may not need supervision of his or her personal care attendant. In some cases, supervision of personal care services by a registered nurse may be unnecessary, but the services of a case manager may be appropriate to oversee the individual's needs. We note that case management services could be reimbursed as either administrative costs or, as applicable, targeted case management services under Medicaid. Our revision to the regulations does not prohibit the supervision of a registered nurse; rather, it allows States to make the determination of when supervision of personal care services is necessary and what type of professional is qualified to supervise the personal care attendant. Therefore, we believe that the need for supervision, whether by a registered nurse or another individual, should be made on a case-by-case basis by the State.

*Id*.

In promulgating the "personal care services" rule, CMS clearly expressed its intent to allow states flexibility in designing their Medicaid programs. *See id*. at 47,897, 47,899-900. CMS's rule provides that a state may choose to define "personal care services" differently for purposes of a waiver of statutory requirements to permit provision of home and community-based services. 42 C.F.R. § 440.167. Washington has obtained a waiver and provides these services. *See* Dkt. 49, Declaration of Chris Imhoff ("Second Imhoff Decl."), Exh. F, Portions of Washington's Home and Community Based Waiver.

## C. Washington's Personal Care Benefits

Washington has chosen to offer optional personal care services through both its Medicaid State Plan and under home and community-based waiver programs. Defendants have submitted portions of Washington's waiver program, which provide that the "State does not make payment to legally responsible individuals for furnishing personal care or similar services." Second Imhoff Decl., Exh. F at 000111. The program defines a "legally responsible person" as

> any person who has a duty under State law to care for another person and typically includes: (a) the parent (biological or adoptive) of a minor child or the guardian of a minor child who must provide care to the child or (b) a spouse of a waiver participant. Except at the option of the State and under extraordinary circumstances specified by the State, payment may not be made to a legally responsible individual for the provision of personal care or similar services that the legally responsible individual would ordinarily perform or be responsible to perform on behalf of a waiver participant.

*Id*. The document also provides that "[r]elatives/legal guardians may be paid for providing waiver services whenever the relative/legal guardian is qualified to provide services . . . ." *Id*.

Washington has also chosen to offer personal care through the Medicaid Personal Care ("MPC") program, which is a state program, providing personal care services to some limited categories of Medicaid recipients. *See* Wash. Admin Code 388-106-0200 through -0235. Washington's community-based long-term care system allows eligible individuals to receive long-term care services in their own homes, or in community residential facilities (adult family homes and boarding homes), rather than in institutional settings such as nursing homes, hospitals, or residential habilitation centers. See Wash. Rev. Code 74.39; 74.39A; Wash. Admin. Code 388-106.

An individual beneficiary who chooses to receive personal care services in his or her own home may choose to have the services delivered by an "individual provider" ("IP") or by a home care agency, which employs caregivers ("AP") who are assigned to individual recipients. Wash. Rev. Code 74.39A.240(4); Wash. Admin. Code 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 through -0560; 388-106-0040(2); .270(6)(d). A beneficiary's plan may also

structure care using both the services of an IP and an AP, with the IP providing some hours of care and AP the remaining hours of care. Second Imhoff Decl. ¶ 10.

A caregiver, whether an IP or an AP, provides personal care services, as outlined in a recipient's "plan of care," up to the maximum number of hours-per-month of care that the Washington Department of Social and Health Services ("DSHS") has authorized for that recipient. Dkt. 21, Declaration of Chris Imhoff ("Imhoff Decl.") ¶¶ 5-10. The maximum number of hours authorized for a client is determined by an assessment mechanism known as the Comprehensive Assessment Rehabilitation and Evaluation ("CARE") tool. *See* Wash. Admin. Code 388-106-0050 through -0145. The CARE tool is also used to develop a recipient's plan of care. *Id.* Whether furnished by an IP or by an AP, the personal care services provided to the client are identical in amount, duration, and scope (except that in some cases an IP may be able to provide certain care services that a home care agency caregiver would be prohibited from providing). Imhoff Decl. ¶ 11.

### 1. Individual Providers

When a recipient chooses to receive services from an IP (or multiple IPs), the recipient (or his or her legal representative (guardian or power of attorney)), assisted by a Department case manager, hires the IP and manages his or her employment, including setting the IP's schedule and supervising the IP on a day-to-day basis. Wash. Admin. Code 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; *see also* Imhoff Decl. ¶ 12. DSHS pays the IP at an hourly rate pursuant to a provider contract and handles all payroll functions. Imhoff Decl. ¶ 12. IPs must meet certain minimum qualifications, including passing a background check and completing certain mandatory training. *See* Wash. Admin. Code 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 through -05799. Moreover, to be qualified to provide care, an IP must enter into a provider contract with DSHS. Wash. Admin. Code 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.

For individuals receiving services from an IP, DSHS's policies and procedures require case managers to put in place a plan for backup care in the event that an IP's inability to provide care poses a threat to the client's health or welfare. Second Imhoff

Decl. ¶ 10.  The backup plan is developed in consultation with the recipient, or his or her

legal representative, and the recipient's family, if necessary, and must be documented and

discussed with the client and the backup caregiver.  *Id.*  In creating a plan for backup care,

the case manager may assign backup care tasks to "informal" caregivers (family or

friends willing to provide care without compensation) or "formal" caregivers like another

IP, or a combination of both.  In addition, the case manager may utilize a home care

agency as the backup care provider.  *Id.* ¶ 11.  In such cases, a particular home care

agency will be authorized by the case manager to provide some portion of the client's

care and will be assigned as the "standby" care provider, ready to send an agency

caregiver to provide care to the recipient in the event that the primary caregiver (the IP) is

unable to provide care for some reason.  *Id.*

The Home Care Quality Authority ("HCQA"), a state commission, exists to

"recruit[], train[], and stabiliz[e] the workforce of individual providers."  Wash. Rev.

Code 74.39A.230.  Specifically, the HCQA recruits prospective IPs, provides them

training opportunities, performs a background check, and, if they qualify, places them on

an IP referral registry.  Wash. Rev. Code 74.39A.250; Wash. Admin. Code Chapter

257-10; *see also* Dkt. 45, Declaration of Rick Hall, ¶¶ 4-5.  In addition, the HCQA

provides

> routine, emergency, and respite referrals of individual providers and
> prospective individual providers to consumers and prospective consumers
> who are authorized to receive long-term in-home care services through an
> individual provider.

Wash. Rev. Code 79.39A.250(1)(f).

### 2. Agency Providers

When a recipient chooses to receive services through a contracted home care

agency, the home care agency assigns an AP to provide care to the recipient.  Imhoff

Decl. ¶ 15.  Home care agencies are licensed by the Washington Department of Health

("Department"), *see* Wash. Rev. Code 70.127; Wash. Admin. Code 246-335, and enter

into provider contracts with the Department to provide personal care services.  Imhoff

Decl. ¶ 15.  As a state-licensed service provider, in the business of providing in-home

care services, a home care agency must comply with licensure requirements set forth in

state statutes and regulations.  *See* Wash. Rev. Code Chapter 70.127; Wash. Admin. Code

Chapter 388-335.

Home care agencies provide recruitment, employment management, supervision,

monitoring, and coordination of caregivers.  Imhoff Decl. ¶ 15.  In particular, as the

employer, the home care agency handles all the functions of an employer, such as

recruiting, hiring and firing, payroll, supervision, and scheduling.  Imhoff Decl. ¶ 15.

APs must also meet the minimum qualifications set forth in DSHS's rules (e.g.,

background check and training).  *See* Wash. Admin. Code 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 through -05799.

**D.  Substitute House Bill 2361**

In April of 2009, the Washington Legislature passed Substitute House Bill 2361.

Dkt. 9, Declaration of Carol Sue Janes, Exh. 1 ("SHB 2361").  On May 19, 2009,

Governor Christine Gregoire signed the bill into law.  *Id*.  The bill reads in relevant part

as follows:

> (1) (a) [DSHS] shall not pay a home care agency licensed under
> chapter 70.127 RCW for in-home personal care or respite services provided
> under this chapter, Title 71A RCW, or chapter 74.39 RCW if the care is
> provided to a client by a family member of the client. To the extent
> permitted under federal law, the provisions of this subsection shall not
> apply if the family member of the family member providing care is older
> than the client.
> (b) The department may, on a case-by-case basis based on the
> client's health and safety, make exceptions to (a) of this subsection to
> authorize payment or to provide for payment during a transition period of
> up to three months.
> ***
> (3) For purposes of this section:
> (a) "Client" means a person who has been deemed eligible by the
> department to receive in-home personal care or respite services.
> (b) "Family member" shall be liberally construed to include, but not
> be limited to, a parent, child, sibling, aunt, uncle, cousin, grandparent,
> grandchild, grandniece, or grandnephew, or such relatives when related by
> marriage.
> (4) The department shall adopt rules to implement this section. The
> rules shall not result in affecting the amount, duration, or scope of the
> personal care or respite services benefit to which a client may be entitled
> pursuant to RCW 74.09.520 or Title XIX of the federal social security act.

*Id*. § 1.

**E.    Implementation of SHB 2361**

    To implement the provisions of SHB 2361, DSHS planned on contacting each affected client to inform them of their choices for delivery of continued care.  Imhoff Decl. ¶¶ 21-22, Second Imhoff Decl. ¶ 20.  DSHS projected a three-month transition period, to allow sufficient time to contact each client and implement their choice.  Second Imhoff ¶ 20.  Under SHB 2361, affected clients can continue to have their family member provide home care services as an IP.  Imhoff Decl. ¶ 21, Second Imhoff Decl. ¶ 20.  A client may also receive their services from a home care agency, through an AP who is not related to them, or from an IP other than their family member, if their family member no longer wishes to act as their paid caregiver.  Second Imhoff Decl. ¶ 20.

    Plaintiffs claim that implementing these options will harm Plaintiffs as well as unnamed Medicaid beneficiaries.  Dkt. 4 at 19.  For example, Cristene L. Allen claims that implementation of SHB 2361 will result in her son, Casey Allen, being placed in an institution instead of receiving home care services.  Dkt. 35, Declaration of Cristene L. Allen, ¶ 12.  Mrs. Allen claims that Casey, "who is a developmentally disabled Medicaid beneficiary," has been "certified to receive 155 personal care hours per month . . . ." *Id*. ¶ 10.  Mrs. Allen claims that she (1) is Casey's AP, (2) is employed by First Choice In-Home Care, an agency that supervises and provides APs, and (3) is paid "an hourly rate of $12.43." *Id*. ¶¶ 6, 7, 10.  As an IP, Mrs. Allen claims that her starting pay would be $10.03 per hour and that wage would make it "impossible to pay the rent on [the family's] apartment." *Id*.

# III. DISCUSSION

**A.    Preliminary Injunction Standard**

    To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that a balance of equities tips in the favor of

the moving party; and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008). Traditionally, injunctive relief was also appropriate under an alternative "sliding scale" test.  *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).  However, the Ninth Circuit overruled this standard in keeping with the Supreme Court's decision in *Winter*.  *American Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (holding that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable").

**B.     Plaintiff's Motion**

As a threshold matter, there is a significant difference between legislative policy making and judicial findings of legal violations.  The facts and issues currently before the Court involve a difficult legislative policy decision and even more difficult judicial determination of whether that legislative decision violates federal Constitutional rights and/or rights provided under certain state statutes.  While the reduction in reimbursement to the person who in the vast majority of situations may be the best caregiver to significantly disadvantaged beneficiaries is an extraordinarily difficult decision to make, the Court may only halt the implementation of that decision if it violates Plaintiffs' rights. The Court is prompted to make these initial comments because, in their briefs, Plaintiffs spend considerable time discussing what they claim are the "realistic" disadvantages of SHB 2361.  The Court is cognizant of the hardships on caregivers when their pay is reduced, especially for those who, like Mrs. Allen, are already struggling to make ends meet.  These benefits and/or disadvantages of SHB 2361, however, are issues that must be presented to and addressed by the Washington legislature.  The issues before this Court are whether the legislature's decision violates Plaintiffs' legal rights.

With regard to the motion, Plaintiffs argue that they have made an adequate showing as to all four parts of the preliminary relief standard.  For the reasons stated

below, the Court finds that Plaintiffs have failed to meet their burden on the element of a likelihood of success on the merits. Plaintiffs' claims are as follows:

SHB 2361's prohibition on family member APs violates:

(1) the ADA's prohibition on discrimination against family members of the disabled and the agencies associated with the disabled;

(2) the ADA's prohibition on actions that have the effect of removing the disabled from the most integrated setting possible;

(3) the right to freedom of choice of Medicaid provider guaranteed under federal Medicaid law;

(4) the right to comparability of care guaranteed under federal Medicaid law; and

(5) the right to quality of care and access guaranteed under federal Medicaid law.

The Court will address each claim.

**1.  Disability Discrimination**

Plaintiffs argue that SHB 2361 violates their rights under (1) the ADA's employment provisions, (2) the law prohibiting discrimination in the administration of public programs, and (3) the ADA's integrated setting requirements. Dkt. 4 at 26-33.

**a.  Employment**

Title I of the ADA provides that covered employers shall not:

discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Specifically, discrimination includes:

excluding or otherwise denying equal jobs or benefits to a qualified individual *because of* the known disability of an individual with whom the qualified individual is known to have a relationship or association.

*Id*. § 12112(b)(4) (emphasis added).

In this case, Plaintiffs argue that "family member APs are entitled to relief because they are harmed by discrimination that is based solely on their status as family members of the disabled." Dkt. 4 at 26. Defendants counter that "[f]undamental to the success of any claim of discrimination under the ADA . . . is a showing that the discrimination complained of is *because of disability*." Dkt. 43 at 34 (emphasis in original). Defendants argue that Plaintiffs' claim "is based on family status, without regard to disability, and is, therefore, not prohibited by the ADA." *Id.* At oral argument, Defendants' counsel put forth the hypothetical that an AP may provide services to any or all of beneficiaries A, B, C, and/or D. Under SHB 2361, if the AP is a family member of beneficiary A, then the AP will not be compensated for providing services as an AP to beneficiary A but may still be compensated for providing services to beneficiary B, C, and/or D. Thus, SHB 2361 discriminates based on the family relationship and not because of the disability of beneficiary A.

For the purposes of this motion, the Court finds that Plaintiffs have failed to establish that they are likely to succeed on the merits of this claim. Specifically, Plaintiffs have failed to show that it is likely that the State discriminates against any named Plaintiff either "on the basis of disability" or "because of the known disability."

### b. Public Programs

In the public programs context, the implementing regulation provides as follows:

> A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity *because of* the known disability of an individual with whom the individual or entity is known to have a relationship or association.

28 C.F.R. § 35.130(g) (emphasis added).

In this case, Plaintiffs have also failed to show that it is likely that they are denied access to public programs "because of" the known disability of an individual.

### c. Integrated Setting Requirement

"A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28

C.F.R. § 35.130(d). The Supreme Court has concluded that the discrimination forbidden under Title II of the ADA includes "[u]njustified isolation" of the disabled. *Olmstead v. Zimring*, 527 U.S. 581, 597 (1999). The "State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless . . . ." *Id*. at 603.

In this case, Plaintiffs claim that implementation of SHB 2361 "may cause beneficiaries to relocate to institutional settings in order to obtain needed services . . . ." Dkt. 4 at 33. First, DSHS uses the CARE tool to certify the number of hours of home care services that are provided to each Medicaid beneficiary. The Court is unqualified to second guess those allocations and the issue before the Court is not whether the allocations are erroneous. Thus, Plaintiffs have failed to show that it is likely that the number of hours of care, if provided by someone other than a family member, would result in the institutionalization of the beneficiary.

Second, SHB 2361 provides for case-by-case exceptions during the transition period. This provision weighs against the "unjustified isolation" of the beneficiaries.

Therefore, Plaintiffs have failed to show that they are likely to succeed on their claims under the ADA.

## 2. Supremacy Clause and Medicaid

The Supremacy Clause provides that: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ." U.S. Const. art. VI, cl. 2. State laws that "interfere with, or are contrary to, federal law" are, therefore, invalidated. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 (9th Cir.2007) (internal quotation marks omitted).

In this case, Plaintiffs claim that SHB 2361 interferes with and/or is contrary to provisions of the federal Medicaid laws and, therefore, Plaintiffs are likely to succeed on the merits of their claims.

#### a.     Freedom of Choice

The Medicaid "freedom of choice" provision provides that:

> any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services . . . .

42 U.S.C. § 1396a(a)(23)(A).

In this case, Plaintiffs argue that "SHB 2361 unlawfully restricts the choice of the plaintiff beneficiaries to obtain services from qualified and willing providers." Dkt. 58 at 24. Defendants counter that the beneficiaries "remain free to choose any qualified and willing individual provider or home care agency to provide personal care services." Dkt. 43 at 24. For the purposes of this motion, the Court agrees with Defendants to the extent that Plaintiffs have failed to show that they are likely to succeed on their claim that SHB 2361 restricts a beneficiary from choosing to receive his or her medical assistance from a person "qualified to perform the services" and "who undertakes to provide him such services."

#### b.     Comparability

The Medicaid "comparability" provision provides that:

> the medical assistance made available to any individual . . . (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and (ii) shall not be less in amount, duration, or scope than the medical assistance made available to persons who are not [categorically needy] . . . .

42 U.S.C. 1396a(a)(10)(B); *see also* 42 C.F.R. § 440.240 (requiring that state plans provide that (a) the services available to categorically needy recipients are "not less in amount, duration, and scope than those services available" to medically needy recipients; and (b) the services available to any individuals within "categorically needy" or "covered medically needy" groups "are equal in amount, duration, and scope for all recipients within the group"); 42 C.F.R. 440.250 (describing limits on comparability of services).

In this case, Plaintiffs argue that "SHB 2361 deprives plaintiff beneficiaries of services comparable to those afforded to other beneficiaries." Dkt. 58 at 26. Defendants argue that "[w]hether furnished by an [IP] or an [AP], the personal care services at issue here are identical in amount, duration, and scope." Dkt. 43 at 25. Plaintiffs counter that "argument that the two different options are "comparable" solely because the number of hours is comparable turns a blind eye to reality." Dkt. 58 at 26. Unfortunately, Plaintiffs' "reality" argument is one of policy, a subject that was considered by the Washington legislature. The Court has already stated that it will not address the issue of whether the certified hours of care provided to each beneficiary are adequate or realistic.

For the purposes of this motion, Plaintiffs have failed to show that they are likely to succeed on their claim that requiring a beneficiary to receive home care services from another AP or IP violates the Medicaid comparability provision.

### c.    Quality of Care and Access

Under the Medicaid Act, a state plan for medical assistance must:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C. § 1396a(a)(30)(A). The Ninth Circuit interprets this provision as requiring Medicaid payment rates to "bear a reasonable relationship to efficient and economical [provider] costs of providing quality services." *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491, 1500 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 684 (1998); *see also California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 850 (9th Cir. 2009).

In this case, Plaintiffs argue that "SHB 2361 is contrary to the mandates of section (30)(A) and, must therefore be declared void and invalid under the Supremacy Clause." Dkt. 4 at 42. Plaintiffs claim that SHB 2361 will result in a "significant reduction in payments to agencies" forcing many of them out of business. Dkt. 58 at 22-23. But the

affected beneficiaries may still choose to receive their services through the home care agencies. SHB 2361 does not prevent a beneficiary from making this choice of provider. Plaintiffs' arguments to the contrary are based on needs and qualifications beyond the requirements of section 30(A).

Plaintiffs essentially claim that, in order to utilize the home care services program, Plaintiff beneficiaries *require* both that a family member be their provider and that the family member provider receive the AP wages and benefits. However, under Washington's program, these beneficiaries qualify for a "plan of care" that specifies the number of personal care services hours which are to be provided by an AP, an IP, or both. Defendants argue that the provisions of section (30)(A) are "inapplicable" because

> SHB 2361 did not change the rates paid to agency providers or individual providers of personal care services. Rather, it simply specified who could not be paid as an employee of an agency provider – an issue entirely outside the scope of § 30(A).

Dkt. 43 at 30-32. The Court agrees. The legislature's decision to force either (1) Plaintiff beneficiaries to choose a non-family member home care agency provider or (2) Plaintiff beneficiaries' family member providers to work for the lower IP wages and no benefits does not likely affect such "care and services [that] are available under the plan . . . ." 42 U.S.C. § 1396a(a)(30)(A).

For the purposes of this motion, the Court agrees with Defendants to the extent that Plaintiffs have failed to show that they are likely to succeed on the merits of their section (30)(A) claim because SHB 2361 does not alter the reimbursement rates of either of the State's approved IP or AP programs. Therefore, Plaintiffs have failed to meet their burden on this issue.

### d.    Medicaid Conclusion

Based on the current record before the Court and the oral arguments of counsel, Plaintiffs have failed to show that they are likely to succeed on the merits of their claim that SHB 2361 violates any provision of the federal Medicaid statutes and/or regulations.

### 3. Equal Protection

Plaintiffs claim that they are likely to succeed on the merits of their claim that SHB 2361 violates their federal right to equal protection of the law. Dkt. 4 at 43-47.

The Supreme Court has stated that:

> The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citations and quotation marks omitted). An Equal Protection analysis consist of three questions: (1) what are the law's classifications, (2) what is the appropriate level of scrutiny, and (3) does the government action meet the level of scrutiny? *See* E. Chemerinsky, Constitutional Law § 9.1, pgs. 643-48 (2nd ed. 2002).

### a. SHB 2361's Classifications

The Equal Protection Clause denies to "states the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." *Reed v. Reed*, 404 U.S. 71, 75-76 (1971). In other words, an individual's right to equal protection of the law may be violated "[o]nly when a governmental unit adopts a rule that has a special impact on less than all the persons subject to its jurisdiction . . . ." *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587-88 (1979).

In this case, Plaintiffs have shown that SHB 2361 applies to all AP's under DSHS's control and that they are disparately treated among AP's based on their familial status. Therefore, the Court must determine the appropriate level of scrutiny.

### b. Level of Scrutiny

"A classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). "Such a classification cannot run afoul of the Equal Protection

Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id*. at 320.

In this case, Plaintiffs have not shown that SHB 2361 involves either fundamental rights or suspect classifications. Therefore, in order to prevail on the merits, Plaintiffs must show that there is not a rational relationship between the disparity of treatment and Washington's legitimate government interest in promulgating SHB 2361.

### c.    Legitimate Government Interest

Plaintiffs argue that SHB is not rationally related to a legitimate government purpose because the "only stated purpose of SHB 2361 is to save money." Dkt. 4 at 45. On the other hand, Defendants argue that

> because the state can reasonably expect family members to contribute to the care of their loved one and the state is afforded flexibility to design a cost-effective Medicaid system, it is reasonable for the state to require family members receiving public compensation for caring for their own family member to deliver it in the most cost-effective means possible, as an individual provider. The Legislature, could, and did, reasonably conclude that limited Medicaid dollars were not well spent paying a home care agency to manage the employment relationship between a care recipient and his or her caregiver if the caregiver was a member of his or her family.

Dkt. 43 at 43-44. Plaintiffs have failed to show that this is not a rational reason. Therefore, Plaintiffs have failed to show that they are likely to succeed on the merits of their Equal Protection Claim.

### 4.    State Law

Plaintiffs claim that SHB 2361 violates both the Washington Administrative Procedure Act, RCW Chapter 34.05 ("APA"), and a provision of Washington's Medicaid law, RCW 74.09.740. Dkt. 4 at 48-51.

### a.    APA

Washington's APA sets out the standard of review for decisions involving administrative rules. The relevant portion of the statute provides:

> In a proceeding involving review of a rule, the court shall declare the rule invalid only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without

compliance with statutory rule-making procedures; or the rule is arbitrary and capricious.

RCW 34.05.570(2)(c).

In this case, Plaintiffs argue that the Court should invalidate SHB 2361 because the State adopted the law without following the statutory rule-making procedures under the APA. Dkt. 4 at 48-51. Defendants counter that

> SHB 2361 is entirely self-executing; there is no subject left about which the Department was required to make any rule, and rulemaking would have been entirely pointless. The Department has interpreted the statute as part of its statutory duty to implement it.

Dkt. 43 at 44. Plaintiffs did not reply to Defendants' arguments. For the purposes of this motion the Court agrees with Defendants to the extent that Plaintiffs have failed to show that they are likely to succeed on the merits of this claim.

### b. Washington's Medicaid Law

Under Washington's Medical Care laws, DSHS must

> seek approval from the federal health care financing administration of any amendments to the existing state plan or waivers necessary to ensure federal financial participation in the provision of services to consumers under Title XIX of the federal social security act.

RCW 79.09.740.

In this case, Plaintiffs argue that SHB 2361 is invalid because they are "unaware of any federal approval for SHB 2361." Dkt. 4 at 48. Defendants counter that SHB 2361 cannot be trumped by a previously enacted statute. Dkt. 43 at 33 (citing *State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 301 ¶ 27, 174 P.3d 1142, 1150 (2007) ("Each duly elected legislature is fully vested with [] plenary legislative power.")). Defendants also argue that RCW 79.04.740 only requires approval for material changes and, if SHB 2361 is a material change, the State is only required to seek approval, not obtain approval. Dkt. 43 at 33-34. Plaintiffs failed to reply to Defendants' arguments. For the purposes of this motion, the Court finds that Plaintiffs have failed to show that they are likely to succeed on the merits of the claim that SHB 2361 violates RCW 79.09.740.

The Court also finds that Plaintiffs have failed to show that they are likely to succeed on their claims that SHB 2361 violates RCW 43.20A.560 and 70.14.050(2). Plaintiffs presented their arguments on these issues in their opening brief and Defendants challenged Plaintiffs on the basis that neither statute provides a private right of action. Plaintiffs failed to reply.

Therefore, for the purposes of this motion and based on the current record before the Court, Plaintiffs have failed to show that they are likely to succeed on the merits of their claims that SHB 2361 violates Washington state laws.

**C.    Conclusion**

It is important to note that the Court may not substitute its judgment for that of the Washington legislature on matters of policy. When the legislature is acting within its scope of authority, the Court must not interfere, whether or not the Court believes that the enactment and enforcement of SHB 2361 is either the prudent or wise exercise of legislative perogative.

Plaintiffs argue that they are likely to succeed on the merits of their claims that SHB 2361 violated the ADA, the Supremacy Clause and provisions of the federal Medicaid act, the Equal Protection Clause, and various Washington state statutes. The Cout, however, finds that Plaintiffs have failed to show that they are likely to succeed on the merits on any claim. The Court notes that Plaintiffs have presented colorable claims that SHB 2361 violates their rights, but, at this point, they have failed to persuade the Court that they are likely to succeed on the merits of those claims. Therefore, the Court denies Plaintiffs' motion for a preliminary injunction.

# IV. ORDER

Therefore, it is hereby

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Dkt. 26) is **DENIED**.

DATED this 12th day of August, 2009.

_____
BENJAMIN H. SETTLE
United States District Judge